EPIC ENERGY LLC,

       Plaintiff,

v.                                               No. CIV 19-0131 RB/JHR

ENCANA OIL & GAS (USA) INC.,

       Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Encana Oil & Gas (USA) Inc.'s (Defendant) Motion to Dismiss Plaintiff's Complaint. (Doc. 5.) Having considered the parties' arguments and the relevant law, the Court will **grant in part** and **deny in part** the motion.

## I.    Factual Background[1]

On April 7, 2016, Epic Energy LLC (Plaintiff), a New Mexico company, entered into a Purchase and Sale Agreement (PSA) with Defendant, a Delaware corporation with its principal place of business in Colorado (*see* Doc. 1 at 2), to purchase Defendant's interest in certain oil wells and oil tank batteries in New Mexico. (*See* Doc. 1-1 (Compl.) ¶¶ 1–2, 5, 15.) After signing two Amendments, the parties agreed that the PSA's effective date would be on or before July 1, 2016. (*Id.* ¶ 15; *see also* Doc. 1-1-B at 13–19.[2]) The PSA included an oil tank battery the parties refer to as the Federal I tank battery (Federal I). (*Id.* ¶¶ 4–5, 15.)

On December 8, 2015, a tank valve in Federal I froze and leaked oil into the soil. (*See id.*

---

[1] The Court recites the facts relevant to this motion as they are derived from the Complaint (Doc. 1-1 (Compl.)) and the exhibits attached thereto.

[2] Doc. 1-1-B includes the PSA and the two Amendments to the PSA. For ease of reference, the Court will refer to the CM/ECF pagination. Thus, Doc. 1-1-B at 13 is the first page of the Second Amendment to the PSA.

¶¶ 5–6; *see also* Doc. 1-1-A.) Under regulations promulgated by the New Mexico Oil Conservation Commission, Defendant was obligated to verbally report the leak to the Oil Conservation Division (the Division) within 24 hours and to file a C-141 form within 15 days. (*See* Compl. ¶¶ 10–11.) *See also* 19.15.29.9–10 NMAC.[3] Defendant verbally reported the leak to a Division inspector on December 14, 2015, and sent an incomplete C-141 form to the Division on December 15, 2015, asserting that "[a]ll liquids and contaminated soil were removed and disposed of in accordance with State rules." (*See* Compl. ¶¶ 8, 12 (quoting Doc. 1-1-A).) According to the allegations in the Complaint, Defendant's assertion was false—it had not properly remediated the oil release. (*See id.* ¶¶ 12, 14.) The Division sent two requests to Defendant asking it to "prove remediation had actually taken place by submitting soil sample data and evidence that [the] contaminated soil had been disposed of[,]" but Defendant did not comply with either request. (*Id.* ¶ 13.) "On April 13, 2016[,] a Division inspector visited the Federal I tank battery and found that the oil release had not been remediated as represented . . . ." (*Id.* ¶ 14.)

As part of the parties' negotiations prior to the PSA's effective date, Plaintiff inspected the Federal I tank battery on April 19, 2016. (*Id.* ¶ 16.) While it was obvious that Defendant had performed recent dirt work at the site, "[t]here was no visible evidence of an oil spill or leak in and around the Federal I." (*Id.*) Defendant never disclosed information to Plaintiff about the oil release or the failed remediation efforts during the parties' negotiations. (*Id.* ¶ 17.)

The PSA was effective on August 1, 2016. (*See* Doc. 1-1-B at 13.) On July 27, 2016, the Division formally recognized Plaintiff as the new operator of the wells. (*Id.* ¶ 19.) In September 2017 the Division notified Plaintiff that Defendant had not complied with its request to provide

---

[3] The relevant Division rules require the "responsible party" to "notify the division of [major] releases . . . verbally or by e-mail within 24 hours of discovery of the release" and "in writing within 15 days of discovery the release by completing and filing form C-141." *See* 19.15.29.10(A)(1)–(2) NMAC.

soil samples in connection with the incomplete C-141 form. (*Id.* ¶ 20.) Representatives from both

parties "and the Division obtained a witnessed soil sample on or about September 6, 2017." (*Id.*)

Testing of the soil sample established that oil remained in the soil; in other words, Defendant had

not completed remediation. (*Id.* ¶ 21.)

Because the Division recognizes Plaintiff as the operator of the wells, the Division is

holding Plaintiff responsible for remediation. (*Id.* ¶ 22.) Plaintiff has formally asked the Division

to hold Defendant responsible for the remediation (*see* Doc. 1-1-C), but the Division continues to

hold Plaintiff liable for compliance with all applicable regulations (*see* Doc. 1-1-D-2; Compl. ¶¶

23–24). *See also* 19.15.29.8, 19.15.29.12, 19.15.29.16 NMAC.[4] Accordingly, Plaintiff has

developed a remediation plan. (*See* Compl. ¶ 25; *see also* Doc. 1-1-E.) The remediation plan "will

cost approximately \$150,000 to perform." (Compl. ¶ 26.)

Plaintiff filed suit in the Eleventh Judicial District Court, State of New Mexico, on January

11, 2019. (*See id.* at 1.) Defendant removed the lawsuit to this Court on February 15, 2019, on the

basis of diversity. (*See* Doc. 1 at 1.)

## II.     Legal Standard

In reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court "must accept all

the well-pleaded allegations of the complaint as true and must construe them in the light most

favorable to the plaintiff." *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1108 (10th Cir. 2015)

(citation omitted). "To survive a motion to dismiss," the complaint does not need to contain

"detailed factual allegations," but it "must contain sufficient factual matter, accepted as true, to

---

[4] The relevant Division rules require "the responsible party" to "remediate the release[,]" 19.15.29.8
NMAC, and describe in detail the remediation requirements, 19.15.29.12 NMAC. Section 19.15.29.16
required Plaintiff to "submit a characterization or remediation plan with a proposed schedule no later than
November 13, 2018." (*See* Doc. 1-1-D-2 (discussing 19.15.29.16 NMAC).)

'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).

## III.    Analysis

Plaintiff has asserted claims for: (1) declaratory judgment and injunctive relief pursuant to N.M. Stat. Ann. §§ 70-2-2, 70-2-3(B), and 70-2-29 (1978) (Compl. ¶¶ 27–33); (2) breach of contract and warranties (*id.* ¶¶ 34–37); (3) fraud and deceit (*id.* ¶¶ 38–41); and (4) breach of contract with respect to taxes (*id.* ¶¶ 42–46). Defendant moves to dismiss all four claims. (Doc. 5.) The Court begins by examining the claim for breach of contract and warranties.

> **A.    Plaintiff has alleged facts sufficient to state a claim for breach of contract pursuant to Section 6(b) of the PSA but may not maintain its claim for breach of warranties pursuant to Section 11.**

In its second claim for relief, Plaintiff (the Buyer) asserts that Defendant (the Seller) breached the parties' PSA and the warranties therein, including the following two provisions:

> 6.    Apportionment of Liabilities. . . .
>        b.    Seller's Retention of Liabilities. Seller shall retain and shall pay, perform, fulfill and discharge . . . (2) any fines, penalties or monetary sanctions imposed by any governmental authorities as a result of violations or non-compliance with law as a result of the ownership, use or operation of the Assets prior to the Effective Date for which a claim has been made, filed, or initiated as of the Closing Date . . . .

> 11.    Seller's Representations and Warranties. Seller represents and warrants to Buyer as of the date of this Agreement and the Closing Date: . . . (vi) no suit, action or other proceeding is pending (including environmental claims) or, to the Knowledge of Seller, threatened against or affecting the Assets; (vii) to Seller's knowledge, the Assets have been operated in compliance with all applicable laws, including environmental laws, and Seller has not received notice of any alleged violations or liability under environmental laws or with respect to the environmental condition of the Assets . . . .

(Compl. ¶¶ 35–36 (quoting Doc. 1-1-B at 21, 22).) Plaintiff contends that Defendant knew of the oil release, submitted an incomplete form to the Division that falsely represented that the spill had

been properly cleaned, and falsely represented to Plaintiff that it had complied with all applicable laws and had not received notice of any violations. (*See id.* ¶¶ 7, 12–13, 17, 36; *see also* Doc. 7 at 13.) Thus, Plaintiff argues that Defendant's representations regarding the Federal I tank battery were false and breached the PSA and its warranties to Plaintiff.

### 1. Plaintiff has stated a claim for breach of Section 6(b) because the remediation plan qualifies as "monetary sanctions."

Defendant first contends that "***no*** 'fines, penalties or monetary sanctions' have been imposed by any governmental authority" pursuant to Section 6(b) of the PSA. (Doc. 5 at 15.) Plaintiff responds that Defendant inadequately remediated the 2015 oil release in violation of Division rules and falsely reported complete remediation. (Doc. 7 at 13.) Section 19.15.29.12 NMAC provides that "[t]he responsible party must remediate all releases regardless of volume[,]" and "[u]nless remediation is completed, and a final closure report submitted, within 90 days of discovery of the release, the responsible party must complete division-approved remediation for releases either pursuant to a remediation plan approved pursuant to 19.15.29.12 NMAC or pursuant to an abatement plan . . . ." 19.15.29.12(A)–(B)(1) NMAC. As Defendant did not comply with these rules, Plaintiff contends that the cost of the remediation plan is a "monetary sanction[] imposed by [a] governmental authorit[y] as a result of violations or non-compliance with law . . . prior to the Effective Date . . . for which a claim has been . . . initiated as of the Closing Date" in violation of Section 6(b). (Doc. 7 at 13.)

Defendant disagrees and offers four reasons to reject Plaintiff's construction of the term "monetary sanction." First, Defendant argues that the plain meaning of "monetary sanction" forecloses inclusion of the costs of remediation. "'Monetary' means 'of, relating to, or involving money[,]'" and "'[s]anction' means 'a penalty or coercive measure that results from failure to

comply with a law, rule, or order.'" (Doc. 11 at 4 (quoting *Monetary & Sanction*, <u>Black's Law Dictionary</u> (10th Ed. 2014)).) "Thus, 'monetary sanction' means a 'money penalty that results from failure to comply with a law, rule, or order.'" (*Id.*) Defendant argues that "[a]ssuming oversight for and paying a third-party contractor to remediate historical contamination is not a 'monetary sanction.'" (*Id.*) Yet, the costs of the remediation plan stem from Defendant's alleged failure to remediate the oil release "in accordance with State rules" in 2015. (*See* Compl. ¶¶ 12–14.) *See also* 19.15.29.12 NMAC. Because of Defendant's failure, Plaintiff has now been ordered to perform remediation of the release. (Compl. ¶ 22.) Thus, the cost of performing the remediation can be construed as a sanction that resulted from Defendant's failure to comply with State rules that required it to properly remedy the oil release.

Second, Defendant argues that "Plaintiff's construction violates the . . . principle" that "'[w]here general words follow an enumeration of persons or things of a particular and specific meaning, the general words are not construed in their widest extent but are instead construed as applying to persons or things of the same kind or class as those specifically mentioned.'" (Doc. 11 at 4 (quoting *Lucero v. Richardson & Richardson, Inc.*, 39 P.3d 739, 745 (N.M. Ct. App. 2001)).) For example, the New Mexico Court of Appeals held that "in interpreting the language 'buildings, structures, trees, shrubs or other natural features,'" the term "other natural features included only above-ground, not subsurface, features, since all the features listed existed above ground." *Lucero*, 39 P.3d at 745 (quoting *Hartman v. Texaco*, 937 P.2d 979, 982 (N.M. Ct. App. 1997)). Defendant argues that construing "'monetary sanctions' to mean 'assume responsibility and pay for the costs of any remediation' constitutes 'the widest extent' of those words, much different from the 'same kind or class' as 'fines and penalties.'" (Doc. 11 at 4–5.) The Court disagrees. The Division requires that remediation occur as a consequence of the release—the Court finds this falls

comfortably into a "sanction" as used in the provision.

Defendant next argues that "Plaintiff's construction ignores" Section 6(a) of the PSA, which provides "that Plaintiff 'shall assume, pay for and perform all claims, taxes, costs, expenses, liabilities and obligations accruing or relating to . . . [the Assets] . . . including those related to the environmental condition of the Assets." (*Id.* at 5 (quoting Doc. 1-1-B at 20).) Defendant does not, however, quote the entire text of Section 6(a), which provides:

> (6)  Apportionment of Liabilities.
>       (a)  Buyer's Assumption of Liabilities.
>            i.  **Except for the Retained Liabilities** and the allocation of
> revenues and expenses set forth in Section 6(c), after closing Buyer shall assume,
> pay for and perform all claims, taxes, costs, expenses, liabilities and obligations
> accruing or relating to owning, developing, exploring, operating or maintaining the
> Assets or producing, transporting and marketing  of Hydrocarbons produced from
> the Assets, arising either before or after the Effective Date, including those related
> to the environmental condition of the Assets . . . .

(Doc. 1-1-B at 20 (emphasis added).) While Section 6(a) dictates that Plaintiff generally will be responsible for all obligations after closing, Section 6(b) carves out several specific items that Defendant will **retain liability** for, including "any fines, penalties or monetary sanctions imposed by any governmental authorities as a result of violations or non-compliance with law . . . ." (*Id.* at 21.) Defendant explains neither how this construction of Section 6(b) renders Section 6(a) meaningless, nor how its own construction is superior.

Finally, Defendant argues that its "responsibility for 'fines, penalties or monetary sanctions' is limited to those 'for which a claim has been made, filed, or initiated as of the Closing Date . . . .'" (Doc. 11 at 5 (quoting Doc. 1-1-B at 21).) The Division initially contacted Defendant about remediation prior to the closing date; thus, the claim for remediation fits within this limitation. For these reasons, the Court finds that Plaintiff has sufficiently stated a claim for breach of contract pursuant to Section 6(b) and denies Defendant's motion on this issue.

## 2. Plaintiff's claim for breach of warranties pursuant to Section 11 is barred by the PSA's survival clause.

Defendant next argues that Plaintiff's claim for breach of warranties pursuant to Section 11 is barred by Section 26—the "survival clause."[5] (Doc. 5 at 15 (citing Doc. 1-1-B at 27).) A survival clause attempts to dictate "[t]he extent to which the representations, warranties and covenants of the parties survive termination or expiration of the agreement . . . ." Alan S. Gutterman, Bus. Transactions Sols. § 113:116 (Aug. 2019). Here, the survival clause provides:

> The representations and warranties set forth in Sections 11 and 12 shall survive for six (6) months following closing. The provisions of covenants and indemnities in this Agreement shall survive indefinitely. The remainder of this Agreement shall not survive closing unless a provision is required by its context to survive closing.

(Doc. 1-1-B at 27.) Thus, Defendant contends, even if it breached the "Representations and Warranties" contained in Section 11 (*see* Doc. 1-1-B at 22), any claims based on that breach were barred six months after closing. (Doc. 5 at 15.) Plaintiff argues that the survival clause is unenforceable because it violates public policy. (Doc. 7 at 14–18.)

The parties acknowledge that there is no New Mexico Supreme Court decision directly on point, thus the "[C]ourt must endeavor to predict what the state's highest court would do if it were faced with the same facts and issues." *Miller v. Cincinnati Ins. Co.*, 323 F. Supp. 3d 1253, 1259 (D.N.M. 2018) (citing *Stickley v. State Farm Mut. Auto Ins. Co.*, 5050 F.3d 1070, 1077 (10th Cir. 2007)). "In making that prediction, a court considers 'analogous decisions by the [state] Supreme Court, the decisions of the lower courts in [the state], the decisions of the federal courts and of other state courts.'" *Id.* (quoting *Phillips v. State Farm Mut. Auto. Ins. Co.*, 73 F.3d 1535, 1537 (10th Cir. 1996)).

---

[5] Defendant does not argue that the Survival Clause bars Plaintiff from suing pursuant to Section 6(b). (*See* Docs. 5; 11.)

At issue is whether the New Mexico Supreme Court would prohibit private parties to a PSA from contractually shortening the statute of limitations for breach of a representations and warranties clause to six months, from the six years allowed by statute. *See* N.M. Stat. Ann. § 37-1-3 ("Actions founded upon any bond, promissory note, bill of exchange or other contract in writing shall be brought within six years."). The Court begins with the New Mexico Supreme Court's observation that New Mexico courts "consistently have held that contractual limitations on actions, including time-to-sue provisions, will be enforced unless they violate public policy." *New Mexico ex rel. Udall v. Colonial Penn Ins. Co.*, 812 P.2d 777, 779 (N.M. 1991) (citing *Green v. Gen. Accident Ins. Co. of Am.*, 746 P.2d 152, 154 (N.M. 1987); *Diebold Contract Servs., Inc. v. Morgan Drive Away, Inc.*, 617 P.2d 1330, 1332 (N.M. Ct. App. 1980)). Thus, the Court examines the policy reasons underlying statutes of limitations, time-to-sue provisions, and survival clauses.

The New Mexico Supreme Court has noted that statutes of limitations "encourag[e] prompt assertion of legal claims and cut[] off stale claims . . . ." *Roberts Oil Co., Inc. v. Transamerica Ins. Co.*, 833 P.2d 222, 229 (N.M. 1992). Similarly, the *Roberts* Court observed that time-to-sue provisions, which are clauses that limit the time an insured may bring suit pursuant to an insurance contract, also serve "the public interest in prompt assertion of legal claims," reduce "the possibility of fraudulent claims if a long period elapses between [a covered] occurrence and the initiation of a claim, allow[] an insurer to avoid uncertainty as to the amount of its liability, and permit[] stale claims to be cut off." *Id.* (citation omitted).

The Court is unable to find a New Mexico case discussing the public policy reasons behind survival clauses, and particularly with respect to representations and warranties in a contract. The Court of Chancery of Delaware expounded on "four distinct possible ways to draft a contract addressing the life span of the contract's representations and warranties, with each possibility

having the potential to affect the extent and nature of the representing and warranting party's post-closing liability for alleged misrepresentations." *GRT, Inc. v. Marathon GTF Tech., Ltd.*, No. CIV.A. 5571-CS, 2011 WL 2682898, at *13 (Del. Ch. July 11, 2011). Three of these possibilities are clearly inapplicable to the PSA at issue here.[6] Relevant to the parties' PSA, the third possibility the *GRT* Court described is "where the contract contains a discrete survival period during which the representations and warranties will continue to be binding on the party who made them . . . ." *Id.* at *14. It is generally accepted "that the effect of a survival clause with a discrete survival period is to limit the time period during which a claim for breach of a representation or warranty may be filed." *Id.* According to Professor Samuel C. Thompson, Jr., "*it [is] clear* that" when a contract states "that a representation and warranty survives for a year, [it] means that any claim that such representation was false must be made prior to the end of the one-year period. *In other words, the survival period acts as a private statute of limitations on the claim.*" *Id.* (quoting Samuel C. Thompson, Jr., Practising Law Institute, *Mergers, Acquisitions and Tender Offers* § 2:14 (2011)).

The *GRT* Court ultimately adopted this third viewpoint and held that the contract's survival

---

[6] The Court analyzes the PSA using the *GRT* Court's third possibility but will summarize the other three scenarios here. *See GRT, Inc. v. Marathon GTF Tech., Ltd.*, No. CIV.A. 5571-CS, 2011 WL 2682898, at *14 (Del. Ch. July 11, 2011). The first possibility is where "the contract expressly provides that the representations and warranties terminate upon closing" and, thus, the parties may not sue on the representations and warranties after closing. *Id.* at *13. Parties to this type of contract normally "conduct robust due diligence *pre-closing* . . . ." *Id.* In the second situation, "the contract is silent as to whether the representations and warranties survive or expire upon closing[,]" resulting in a lack of clarity and confusion about when a party to the contract may bring suit based on a breach. *See id.* The *GRT* Court noted that some commentators "suggest a hard and fast rule that '[u]nless the parties agree to a survival clause extending the representations and warranties in the agreement past the closing date, the breaching party *cannot be sued* for damages post-closing for their later discovered breach.'" *Id.* (quoting 58 Fletcher Cyc. of the Law of Corporations § 5615 at 336 (2009)); *see also, e.g., W. Filter Corp. v. Argan, Inc.*, 540 F.3d 947, 952 (9th Cir. 2008)). In the fourth situation, "the contract provides that the representations and warranties will survive indefinitely or otherwise does not bound their survival . . . ." *Id.* at *15. Rather than give the parties a limitless time in which to sue, courts generally apply the applicable statute of limitations to claims arising under these provisions. *See id.*

clause, which provided that certain representations would survive for one year after closing, "establish[ed] a one-year limitations period for filing claims alleging a breach of the" clause. *Id.* at *1, 3. The court based its conclusion in part on the basis that Delaware courts respect "parties' contractual choices . . . and there is no special rule requiring that in order to contractually shorten the statute of limitations, parties utilize 'clear and explicit' language." *Id.* at *12. The plaintiff in *GRT*, like Plaintiff here, had urged the court to instead follow the public policy of California and New York, which "does not favor contractual stipulations to limit a statute of limitation" and requires "'clear and explicit' language to that effect." *Id.* (citing *W. Filter Corp. v. Argan, Inc.*, 540 F.3d 947, 952 (9th Cir. 2008); *Herring v. Teradyne, Inc.*, 242 F. App'x 469, 471 (9th Cir. 2007); *Hurlbut v. Christiano*, 63 A.2d 1116, 1117–18 (N.Y. App. Div. 1978)). Plaintiff in this case also argues that the Court should find that such a contractual limitation "must be clear and explicit" and "strictly constructed against the party invoking the provision." (Doc. 7 at 17 (quoting *W. Filter*, 540 F.3d at 953)).) The Court need not look to California and New York public policy, however, because the New Mexico Supreme Court has already specified that "contractual limitations on actions . . . will be enforced unless they violate public policy." *Udall*, 812 P.2d at 779 (citations omitted). Similar to Delaware law, "New Mexico 'has a strong public policy of freedom to contract,' [and] New Mexico courts will respect the parties' agreement unless it 'clearly contravene[s] some law or rule of public morals.'" *Miller*, 323 F. Supp. 3d at 1260 (quoting *Flemma v. Halliburton Energy Servs., Inc.*, 303 P.3d 814, 820 (N.M. 2013)). Plaintiff does not point to any law or rule of public morals that this survival clause might violate. (*See* Doc. 7.)

Plaintiff argues that two more recent New Mexico cases, *Brooks v. State Farm. Ins.*, 154 P.3d 697 (N.M. Ct. App. 2007) and *Whelan v. State Farm Mutual Auto Ins.*, 329 P.3d 646 (N.M. 2014), have changed how New Mexico courts view contractual limitations. (*See* Doc. 7 at 17–18.)

In both cases, the New Mexico Court of Appeals (in *Brooks*) and the New Mexico Supreme Court (in *Whelan*) examined limitations periods for contract actions based on uninsured motorist/underinsured motorist (UM/UIM) insurance policies. In *Brooks*, the court held that "the six-year limitations period for contract actions" pursuant to N.M. Stat. Ann. § 37-1-3 "begins to run upon breach of the insurance contract, where neither the UM statute nor the insurance policy provide otherwise[,]" and not on the date of the accident, as the insurer argued. *Brooks*, 154 P.3d at 698, 699–700. The *Whelan* Court built on that decision in finding that a time-to-sue provision in a UM/UIM contract was unenforceable as a violation of public policy when it began to run on the date of the accident, and not on the date that the claim accrued. *Whelan*, 329 P.3d at 647; *see also Miller*, 323 F. Supp. 3d at 1261–62 (relying on *Whelan* to find that a time-to-sue provision in a UM/UIM contract based on the date of accident was unenforceable as against public policy). *Whelan* is firmly rooted in the public policy underlying the state's UM/UIM statute, which "seeks to protect individual members of the public against the hazard of culpable uninsured motorists by requiring auto insurers to provide coverage for uninsured and underinsured motorist coverage." *Raja v. Ohio Sec. Ins.*, 305 F. Supp. 3d 1206, 1248 n.16 (D.N.M. 2018) (quoting *Whelan*, 329 P.3d at 649) (internal quotation marks omitted). Thus, the time-to-sue provision conflicted with this clear public policy.

The *Raja* Court examined *Whelan* and concluded that the New Mexico Supreme Court would likely decline to extend *Whelan* to a contract relating to commercial property damage, in large part because the policy concerns underlying UM/UIM contracts are inapplicable in the context of a commercial property insurance contract. *See id.* (noting "New Mexico's deliberate policy for protecting an insured from financial consequences from an accident with an uninsured or underinsured driver" and "to protect individual drivers who may not be sophisticated insurance

customers and may find themselves at the wrong end of a power disparity when purchasing an automobile insurance policy"). The court opined that business owners seeking commercial property insurance "are more likely to be on roughly equal footing with the insurer when negotiating a policy." *Id.*

Here, Plaintiff argues that *Whelan*'s reasoning should be applied in the context of the parties' PSA, but it fails to explain why the public policy underlying UM/UIM statutes has any bearing on a non-adhesion contract with parties that apparently had equal bargaining power. *See Roberts Oil*, 833 P.2d at 229 (noting that "[w]hen a contractual modification of the statute of limitations is truly bargained for, there may be good reason to enforce the bargain; but . . . when such provisions appear in contracts of adhesion like insurance policies, their enforcement . . . will probably frustrate the consumer's reasonable expectation that coverage will not be defeated on arbitrary procedural grounds") (internal quotation marks and citation omitted). Similar to the policy underlying statutes of limitations and time-to-sue provisions, the survival clause in this PSA helps define the parties' liability on the representations and warranties clause, encourages the prompt assertion of lawsuits based on the clause, and protects against stale claims. The Court concludes that New Mexico courts would likely allow the survival clause at issue here.

And while the six-month limitation appears at first glance to be extreme when the statutory time limit would normally be six years, the Court finds no evidence to show that the parties to the contract were inexperienced or otherwise unable to negotiate the terms of the contract. The parties clearly expressed their intent to shorten the time to sue on Sections 11 and 12 to six months, as the survival clause provides longer periods for other provisions. (*See* Doc. 1-1-B at 27 (allowing "[t]he provisions of covenants and indemnities . . . [to] survive indefinitely" and providing that the remainder of the PSA "shall not survive closing unless a provision is required by its context to

survive closing"). *See also GRT, Inc.*, 2011 WL 2682898, at \*10–11 (noting that the parties "designated three specific buckets of representations and warranties, each of which provides for a different survival period"). The contractual shortening of the statute of limitations was part of the parties' consideration for the PSA. As Plaintiff has failed to demonstrate that the survival clause violates public policy, the Court will grant Defendant's motion on this issue and dismiss Plaintiff's claim for breach of warranties pursuant to Section 11. This result supports New Mexico's strong public policy of freedom to contract and is "harmonious with the public policy purposes served by statutes of limitations in general." *See id.* at \*6.

**B.    Plaintiff has alleged facts sufficient to maintain a claim for fraud.**

The New Mexico Supreme Court has held that "[w]hen one is under the duty to speak, but remains silent and so fails to disclose a material fact, he may be liable for fraud." *Wirth v. Commercial Res., Inc.*, 630 P.2d 292, 297 (N.M. Ct. App. 1981) (citing *Everett v. Gilliland*, 141 P.2d 326, 330–31 (N.M. 1943)). In its third count, Plaintiff asserts that "[t]he unremediated oil release . . . was a material fact" to the PSA, and Defendant knew about and "intentionally . . . failed to disclose the information to" Plaintiff when it "had a duty to truthfully disclose" the information. (Compl. ¶¶ 39–40.) Defendant argues that it did not owe Plaintiff a duty to disclose, and "imposing a duty to disclose would be contrary to the Parties' Agreement and is therefore precluded by law." (Doc. 5 at 21.)

The parties agree that "New Mexico case law clearly recognizes that a claim for fraud 'may be predicated on concealment where there is a duty to disclose.'" *Azar v. Prudential Ins. Co. of Am.*, 68 P.3d 909, 927–28 (N.M. Ct. App. 2003) (quoting *R.A. Peck, Inc. v. Liberty Fed. Sav. Bank*, 766 P.2d 928, 932 (N.M. Ct. App. 1988); citing *Krupiak v. Payton*, 561 P.2d 1345, 1346 (N.M. 1977) ("recognizing in a fraud case that duty to disclose may arise if there is knowledge that the

other party is acting under a mistaken belief or if one has superior knowledge not within the reach of the other party or which could not have been discovered by the exercise of reasonable diligence"); *Wirth*, 630 P.2d at 297 ("recognizing in a fraud case that when one is under a duty to speak, but remains silent and fails to disclose a material fact, he may be liable")). "Thus, 'a person may be held liable for damages caused by a failure to disclose material facts to the same extent that a person may be liable for damages caused by fraudulent or negligent misrepresentation.'" *Id.* (quoting *Peck*, 766 P.2d at 932). The *Azar* Court cited approvingly to the Restatement (Second) of Torts § 551:

> [A party] is under a duty to exercise reasonable care to disclose to the other . . . facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

*Id.* (quoting Restatement (Second) of Torts § 551(2)(3)) (subsequent citations omitted). In determining whether a party has a duty to disclose material facts, courts "typically consider a number of factors, including the relationship between the parties, the relative knowledge of the parties, the reasonable expectations of the plaintiff, the practices or customs of the trade, and other relevant circumstances . . . ." *Id.*

Construing the facts in a light most favorable to Plaintiff, the Court finds that Defendant was under a duty to disclose information related to the release. According to the allegations in the Complaint, at the time the parties negotiated the PSA, Defendant knew about the oil release, knew that its remediation efforts did not comply with the law, and knew that it had allegedly shirked its duty under the regulations. (*See* Compl. ¶¶ 7–8, 11–14, 16–17.) Defendant knowingly misrepresented in the PSA its compliance with environmental regulations and its dealings with the Division due to the 2015 release. (*See* Doc. 1-1-B at 22–23.) Defendant makes much of the fact

that the PSA "disavows *any duty* on [it] to disclose the environmental condition of the assets to Plaintiff." (Doc. 11 at 12.) The Court disagrees.

The New Mexico Supreme Court observed that in certain business transactions, there are situations "when the law imposes upon a party a duty to speak rather than to remain silent in respect to certain facts within his knowledge and thus to disclose information, in order that the party with whom he is dealing may be placed on an equal footing with him." *Everett*, 141 P.2d at 330 (N.M. (quoting 23 Am. Jur. 854 § 78). Defendant placed Plaintiff on unequal footing when it falsely claimed that "no suit, action or other proceeding is pending (including environmental claims) or, to the Knowledge of Seller, threatened against or affecting the Assets" and that "the Assets have been operated in compliance with all applicable laws, including environmental laws, and Seller has not received notice of any alleged violations or liability under environmental laws or with respect to the environmental condition of the Assets . . . ." (*See* Doc. 1-1-B at 22–23.)

The Court finds further guidance in *V.S.H. Realty, Inc. v. Texaco, Inc.*, 757 F.2d 411 (1st Cir. 1985). There, the parties entered into a sales agreement for a bulk storage petroleum facility. *Id.* at 413. The seller affirmatively disclosed one oil release but failed to disclose other leaks or investigations thereof, and the First Circuit held that the buyer sufficiently stated a claim for misrepresentation. *Id.* at 414–15. The Court noted that

> Although there may be "no duty imposed upon one party to a transaction to speak for the information of the other . . . if he does speak with reference to a given point of information, voluntarily or at the other's request, he is bound to speak honestly and to divulge all the material facts bearing upon the point that lie within his knowledge. Fragmentary information may be as misleading . . . as active misrepresentation, and half-truths may be as actionable as whole lies . . . ."

*Id.* (quoting Harper & James, Torts, § 7.14) (subsequent citations omitted). Here, Defendant referenced the environmental condition and investigations of the assets and was "bound to speak

honestly." *See id.* Plaintiff relied on Defendant's knowingly false statements about the environmental condition of the assets. *Cf. Wirth*, 630 P.2d at 297 ("[t]o reveal some information on a subject triggers the duty to reveal all known material facts") (citing *Everett*, 141 P.2d at 330).

Defendant argues that the onus was "on Plaintiff to 'review and investigate [Defendant's] . . . files and records related to the operation and condition of the Assets.'" (Doc. 5 at 23 (quoting Doc. 1-1-B at 23).) However, "the general rule that due diligence will forestall a claim of reliance on misrepresentations applies only where a seller and buyer have equal knowledge or access to the facts." *Mountain Highlands, LLC v. Hendricks*, No. CIV.08-0239 JB/ACT, 2009 WL 1300750, at *6 (D.N.M. Feb. 13, 2009), on reconsideration, No. CIV 08-0239 JB/ACT, 2009 WL 2432678 (D.N.M. July 2, 2009) (citing *C. Lambert & Associates, Inc. v. Horizon Corp.*, 748 P.2d 504, 507 (N.M. 1988) ("allowing claim despite 'as is' clause because of unequal knowledge")). The Court finds that Plaintiff has sufficiently alleged a claim for fraud based on Defendant's affirmative misrepresentation of facts material to the contract.[7] *See Salmeron v. Highlands Ford Sales, Inc.*, 271 F. Supp. 2d 1314, 1319–20 (D.N.M. 2003) (finding actionable fraud where a car dealer affirmatively misrepresented to the buyer that the car had been "driven only by the dealership, when in fact [it] knew that the [c]ar ha[d] been used as a daily rental vehicle").

## C.    Plaintiff has stated a claim for breach of contract regarding taxes owed.

In its fourth claim for relief, Plaintiff alleges that Defendant breached Section 6(b)(1) of the PSA, which provides that Defendant "shall retain and shall pay, perform, fulfill and discharge . . . all taxes attributable to the ownership, use, or operation of the Assets prior to the Effective Date . . . ." (*See* Compl. ¶¶ 43–44 (quoting Doc. 1-1-B at 21).) Plaintiff asserts that the Rio Arriba

---

[7] Defendant references an email that is not included in the Complaint or its attachments. (*See* Doc. 11 at 12–13.) The Court declines to consider this document, as Defendant raised it for the first time in its reply brief. *See United States v. Harrell*, 642 F.3d 907, 918 (10th Cir. 2011).

County Assessor notified Plaintiff in December 2017 that certain gas gathering lines, acquired as part of the PSA, "were subject to county property taxes" that had been "unpaid for the previous ten years." (*Id.* ¶ 44.) Plaintiff paid the tax bill and then requested reimbursement from Defendant. (*Id.* ¶¶ 44–45.)

Defendant argues that Plaintiff was required to give it notice of the bill *before* paying it, so that Defendant had an opportunity to "defend." (Doc. 5 at 24 (citing Restatement (Second) of Judgments, § 57, cmt. e (1982); 73 ALR 2d 504; *Bassett v. Atwell*, Civ. No. 02-0189 MCA/WWD, 2003 WL 27385255, at \*4 (D.N.M. Apr. 4, 2003)).) Defendant relies on the federal court decision in *Bassett*, where the court was faced with plaintiffs who had sold their home with the help of the defendant, a realtor. *See Bassett*, 2003 WL 27385255, at \*1. The buyer later sued the plaintiffs for misrepresentation. *See id.* The realtor was not named in the lawsuit, but "[h]e was deposed; he produced documents; and he testified at the trial." *Id.* After they lost, plaintiffs sought indemnification from the realtor. *See id.* at \*4. Discussing the theory of indemnity estoppel but without citing any New Mexico authority on the issue, the court found that plaintiffs were not entitled to recovery, because they had been required to give the realtor notice and an opportunity to "assume or participate in [his] defense . . . ." *Id.* (quoting Restatement (Second) of Judgments, § 57(1)). *Bassett* is distinguishable from the circumstances here, because Plaintiff did not pay the tax bill pursuant to a lawsuit.[8] As Defendant has cited no relevant authority applicable to the circumstances of this case, it has failed to demonstrate that Plaintiff was required to give notice before paying a debt for which Defendant had contractually retained liability. The Court will

---

[8] Plaintiff cites to several cases for the proposition that "an indemnitee may settle a disputed third-party claim without relinquishing rights to recover from the indemnitor pursuant to an indemnification agreement covering the matter that was the subject of the claim." (*See* Doc. 7 at 23 (quoting *Bergerson Plumbing & Heating, Inc. v. Poole*, 807 P.2d 223, 225 (N.M. 1991)) (subsequent citations omitted).) However, notice was not at issue in any of the cases on which Plaintiff relies.

therefore deny its motion on this issue.

### D. Plaintiff has properly pled a cause of action under the Declaratory Judgment Act, but it has not sufficiently stated a claim for injunctive relief.

In its first claim, Plaintiff asks the Court to declare that Defendant is responsible for performance of the remediation plan and to enjoin Defendant to perform and pay for the remediation plan. (*See* Compl. ¶¶ 31, 33.) Plaintiff agrees that because this case was removed solely on the basis of diversity, the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, "will control the procedure governing Plaintiff's claim for declaratory judgment." *See Miller*, 323 F. Supp. 3d at 1256 (noting that the federal Declaratory Judgment Act "does not create substantive rights for parties . . . [but] merely provides another procedure whereby parties may obtain judicial relief") (quoting *Farmers Alliance Mut. Ins. Co. v. Jones*, 572 F.2d 1384, 1386 (10th Cir. 1978)). (*See also* Doc. 7 at 6 n.1 ("Plaintiff does not dispute that procedurally the federal declaratory act applies.").)

The Federal Declaratory Judgement Act provides:

> In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a). The Tenth Circuit has explained that the Declaratory Judgement Act "presents two separate hurdles for parties seeking a declaratory judgment to overcome." *Surefoot LC v. Sure Foot Corp.*, 531 F.3d 1236, 1240 (10th Cir. 2008) (citation omitted). "First, a declaratory judgment plaintiff must present the court with a suit based on an 'actual controversy,' a requirement the Supreme Court has repeatedly equated to the Constitution's case-or-controversy requirement." *Id.* (citing *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 239–40 (1937); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)) (subsequent citations

omitted). Second, where an actual controversy exists, district courts are not *required* to declare the parties' rights, but instead "are entitled to consider a number of case-specific factors in deciding whether or not to exercise their statutory declaratory judgment authority." *Id.* (citing *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 982–83 (10th Cir. 1994)) (subsequent citations omitted).

### 1. Plaintiff has alleged facts sufficient to show an actual controversy.

Defendant argues that Plaintiff is unable to pass the first hurdle and moves to dismiss on the basis that "Plaintiff asks the Court to declare [Defendant's] liability for its *past acts*[,]" which do not qualify as actual controversies under the Declaratory Judgment Act. (Doc. 5 at 6.) "'[T]he phrase "case of actual controversy" in the Act refers to the type of "Cases" and "Controversies" that are justiciable under Article III' of the United States Constitution." *Columbian Fin. Corp. v. BancInsure, Inc.*, 650 F.3d 1372, 1376 (10th Cir. 2011) (quoting *MedImmune*, 549 U.S. at 127). In other words, the Court may not issue an advisory opinion in a suit brought under the Declaratory Judgement Act. *See id.* "The question comes down to 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, *of sufficient immediacy and reality* to warrant the issuance of a declaratory judgment.'" *Id.* (quoting *MedImmune, Inc.*, 549 U.S. at 127).

For example, in *Aetna*, a lawsuit about an insurance policy and "the first decision of the Supreme Court under the Declaratory Judgment Act[,]" Haworth had presented several claims for disability, and Aetna had rejected them. *See Columbian Fin. Corp.*, 650 F.3d at 1377 (discussing *Aetna*, 300 U.S. at 237–39). "But instead of Haworth's bringing suit to challenge Aetna's rejection, Aetna filed an action for a declaratory judgment that Haworth was not disabled and that his policies had therefore lapsed for nonpayment." *Id.* The Supreme Court held that Aetna's lawsuit presented an actual controversy. *See id.*; *Aetna*, 300 U.S. at 244. "[T]he parties had adopted 'adverse

positions with respect to their *existing* obligations'" regarding Haworth's disability. *Columbian Fin. Corp.*, 650 F.3d at 1377 (quoting *Aetna*, 300 U.S. at 242). "Aetna, it said, should not have to wait until Haworth sued because evidence of current facts could be lost and Aetna was, absent resolution in its favor, 'compelled [presumably by state law] to maintain reserves in excess of $20,000' with respect to the policies." *Id.* (quoting *Aetna*, 300 U.S. at 239).

More recently "[i]n *MedImmune*[,] a patent licensee, who had continued to pay royalties for use of the patent, brought a declaratory-judgment action against the patent holder to determine whether the patent was invalid or unenforceable." *Id.* (citing *MedImmune*, 549 U.S. at 121–25). Because the patent licensee paid royalties as required, there appeared to be no immediate threat of patent infringement and the Supreme Court was called on to determine if there was an actual controversy as required for a declaratory judgment. *See id.*; *MedImmune*, 549 U.S. at 127. The Supreme Court noted that there would have been no dispute about an actual controversy if the licensee "had taken the final step of refusing to make royalty payments . . . ." *MedImmune*, 549 U.S. at 128. It had not, however, because it had been "'coerced' by the looming threat of . . . having to pay treble damages if it halted payments and the patent was ultimately upheld. Avoidance of such dilemmas 'was the very purpose of the Declaratory Judgment Act.'" *Columbian Fin. Corp.*, 650 F.3d at 1377 (quoting *MedImmune*, 549 U.S. at 129).

Similarly, here, the parties disagree about their existing obligations—that is, who is responsible for performing and paying for the remediation plan. Plaintiff seeks a declaration from the Court that Defendant, and not Plaintiff, is ultimately responsible for paying the costs associated with the plan, as Defendant was allegedly responsible for the spill that necessitated the plan. Defendant frames Plaintiff's request as one seeking a declaratory judgment for its past acts, but the Court finds Plaintiff's first cause of action is proper because it seeks a declaration that will

resolve future obligations—who is responsible for performing the remediation plan. (*See* Compl.

¶ 31 (asking the Court to determine that Defendant is "responsible for complete performance of

the" remediation plan).) *See also Jordan v. Sosa*, 654 F.3d 1012, 1025 (10th Cir. 2011) (noting

that a plaintiff seeking a declaratory judgment "must assert a claim for relief that, if granted, would

affect the behavior of the particular parties listed in his complaint") (citations omitted). As in

*MedImmune*, Plaintiff has thus far complied with Division demands, but it seeks an order relieving

it from future responsibility. There is no need for the parties to wait until Plaintiff has fully

performed and is then forced to seek monetary damages from Defendant after the fact.

      **2.**     **Consideration of the *Mhoon* factors supports a finding that it is appropriate to exercise jurisdiction under the Declaratory Judgement Act.**

Having found that jurisdiction is proper, the Court turns to the second hurdle—whether

Plaintiff's lawsuit warrants the Court's attention. *See Surefoot*, 531 F.3d at 1248.

> These factors include:
> [1] whether a declaratory action would settle the controversy; [2] whether it would serve a useful purpose in clarifying the legal relations at issue; [3] whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race to res judicata "; [4] whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and [5] whether there is an alternative remedy which is better or more effective.

*Id.* (quoting *Mhoon*, 31 F.3d at 983). The Court finds that the *Mhoon* factors weigh in favor of

issuing the requested declaratory judgment because such a declaration will settle the controversy

of who is ultimately responsible for performing the remediation plan; it will clarify the parties'

legal relations; and the parties point to no friction between the federal and state courts. *See id.*

Indeed, Defendant does not argue that the Court should not exercise jurisdiction pursuant to the

*Mhoon* factors. (*See* Docs. 5; 11.)

### 3. The Court will deny the remainder of Defendant's motion on the declaration issue.

Defendant offers several other reasons the Court should dismiss Plaintiff's first claim for relief. First, Defendant spends some effort attempting to identify two separate requests for declarations: (1) that Defendant "is in violation of law and regulation" and (2) that Defendant is "the party responsible for the complete performance of the" remediation plan. (*See* Docs. 5 at 6–10; 11 at 1–3.) The language in Plaintiff's Complaint reads: Defendant "is and should be held in violation of law and regulation and determined to be the party responsible for complete performance of the" remediation plan. (Compl. ¶ 31.) For practical purposes, the Court finds that the two "separate" declarations are necessarily intertwined—Plaintiff asks the Court to find that Defendant was responsible for the spill at the time it occurred and is therefore responsible for repairing the resulting damages.

Defendant next argues that the requested declaration is contrary to the parties' PSA because the remediation plan does not fall under its retained liabilities for fines, penalties, or monetary sanctions. (Doc. 5 at 7–8.) The Court has already rejected this argument. (*See supra* Sec. IV(A)(1).)

Defendant also contends that the requested declaration violates New Mexico law. (Doc. 5 at 9.) It argues that because Plaintiff has "never challenged" the Division's determination that Plaintiff is the responsible party under the applicable regulations, it has not exhausted the necessary administrative remedies. (*Id.* (citing *Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 140 F. Supp. 3d 1123, 1163 (D.N.M. 2015); *Grand Lodge of Ancient & Accepted Masons of N.M. v. Taxation & Revenue Dep't*, 740 P.2d 1163, 1165 (N.M. Ct. App. 1987) ("Under New Mexico law, declaratory judgment is 'not intended as a substitute for statutory judicial review of administrative action.'")).) Frustratingly, Plaintiff fails to respond to this argument. (*See* Doc. 7.)

The Court agrees that ordinarily a party filing a lawsuit pursuant to N.M. Stat. Ann. § 70-2-29 must exhaust certain administrative remedies. The New Mexico Oil and Gas Act provides that the Attorney General may "bring suit on the Division's behalf to impose civil penalties against any person that is violating or threatening to violate 'any provision of [the] act, or any rule, regulation or order made thereunder.'" *Harvey E. Yates Co. v. Cimarex Energy Co.*, No. 12-857 JH/SMV, 2014 WL 11512599, at *8 (D.N.M. Mar. 5, 2014) (citing N.M. Stat. Ann. § 70-2-28; *Marbob Energy Corp. v. N.M. Oil Conservation Comm'n*, 206 P.3d 135 139–40 (N.M. 2009)). In addition, "[s]ection 70-2-29 grants private citizens the right to enforce the Act when the Division does not and clarifies that the Act does not impair any private party's suit for damages . . . ." *Id.*

> Nothing in this act contained or authorized, and no suit by or against the commission or the division, and no penalties imposed or claimed against any person for violating any statute of this state with respect to conservation of oil and gas, or any provision of this act, or any rule, regulation or order issued thereunder, shall impair or abridge or delay any cause of action for damages which any person may have or assert against any person violating any statute of the state with respect to conservation of oil and gas, or any provision of this act, or of any rule, regulation or order issued thereunder. Any person so damaged by the violation may sue for and recover such damages as he may be entitled to receive. In the event the division should fail to bring suit to enjoin any actual or threatened violation of any statute of this state with respect to the conservation of oil and gas, or any provision of this act, or of any rule, regulation or order made thereunder, then any person or party in interest adversely affected by such violation, and who has notified the division in writing of such violation or threat thereof and has requested the division to sue, may, to prevent any or further violation, bring suit for that purpose in the district court of any county in which the division could have brought suit . . . .

*Id.* (quoting N.M. Stat. Ann. § 70-2-29).

The court in *Harvey E. Yates* was called on to decide an analogous exhaustion issue. *See id.* There, the defendant, "a working interest owner and operator of [certain] oil and gas interests[,] . . . developed a plan to utilize the regulatory process of the [Division] to invade the higher oil and gas reserves" in which the plaintiffs had a working interest. *Id.* at *3. The plaintiffs sued for tortious

interference with prospective contracts, and the defendant moved to dismiss in part on the basis that the plaintiffs had not exhausted their remedies under section 70-2-29. *See id.* at *6–9. The court found that the purpose of the exhaustion doctrine—"to permit the agency to resolve factual issues within its particular expertise in order to best serve the interests of justice"—would not be served by exhaustion in that case. *See id.* at *8. The court observed that "[t]he New Mexico Oil Conservation Commission and Division have powers to prevent waste and protect correlative rights." *Id.* at *9 (citing N.M. Stat. Ann. § 70-2-11). "The Oil and Gas Act, however, does not empower the Commission to determine private causes of action for damages; instead, for private damages actions, district courts retain jurisdiction to determine those suits." *Id.* (citing N.M. Stat. Ann. §§ 70-2-28–31)) (subsequent citations omitted). The court held that "[b]ecause neither the Division nor Commission have jurisdiction to consider [the p]laintiffs' tort claims for damages, the exhaustion of remedies doctrine does not apply and this Court has jurisdiction to consider [the p]laintiffs' tort causes of action for damages." *Id.* (citation omitted). Similarly, here, the Division does not have authority to interpret the parties' contract and decide whether Defendant retained liability for payment of the remediation plan. *See id.* Thus, the Court finds that Plaintiff was not required to exhaust its administrative remedies under section 70-2-29 before filing this action.

### 4.     Plaintiff has not sufficiently asserted a claim for injunctive relief.

Next, Defendant argues that section 70-2-29 does not authorize an injunction that requires Defendant to pay for the remediation plan. (*See* Doc. 5 at 10–11 (noting that "[b]y its express terms, Section 70-2-29 injunctions are limited to those required to 'prevent any or further violation' of state conservation laws, the Oil and Gas Act, or its corresponding rules, regulations or orders issued thereunder").) Defendant also argues that Plaintiff has not shown irreparable harm. (*Id.* at 13.) Plaintiff does not substantively respond to either argument. (*See* Doc. 7.) Plaintiff does assert

that it "requests that the Court enforce a judgment by mandatory injunction." (Doc. 7 at 3 (citing 28 U.S.C. §§ 2201–02).) As Plaintiff did not include this claim in its Complaint, the Court will grant Defendant's motion on this issue. If Plaintiff wishes to file an amended complaint to add a colorable claim for injunctive relief pursuant to 28 U.S.C. §§ 2201–02, it must do so no later than **September 18, 2019**.[9]

    **THEREFORE**,

    **IT IS ORDERED** that Defendant's Motion to Dismiss Plaintiff's Complaint (Doc. 5) is **GRANTED IN PART** as follows:

    Count I: The Court **denies** Defendant's motion to dismiss Plaintiff's declaratory judgment action and **grants** Defendant's motion to dismiss Plaintiff's requested injunctive relief.

    Count II: The Court **denies** Defendant's motion to dismiss Plaintiff's claim for breach of contract and **grants** Defendant's motion to dismiss the claim for breach of warranties.

    Count III: The Court **denies** Defendant's motion to dismiss Plaintiff's claim for fraud and deceit.

    Count IV: The Court **denies** Defendant's motion to dismiss Plaintiff's claim for breach of contract for taxes owed.

    If Plaintiff wishes to file an amended complaint to add a claim for injunctive relief as discussed herein, it must file an appropriate motion no later than **September 18, 2019**.

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE

---

[9] Defendant again wades through the same arguments regarding the parties' contractual language to argue that an injunction would violate the PSA. (Doc. 5 at 12–13.) The Court finds that this argument fails for the same reasons addressed above.